COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Fitzpatrick, Judges Frank and Clements


R. W. AND
 P. W.

                                             MEMORANDUM OPINION[*]

v.       Record No. 1313-03-1                          PER CURIAM
                                            NOVEMBER 25, 2003

CHESAPEAKE DEPARTMENT OF
 HUMAN SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Frederick H. Creekmore, Judge

(James E. Short; Roy, Larsen, Romm & Lascara, P.C., on brief), for
appellants.

(John E. Oliver, Deputy City Attorney, on brief), for appellee.

(Richard L. Buyrn, on brief), Guardian *ad litem*, for the infant
children.


R.W. (father) and P.W.[1] (mother) (collectively "parents") appeal a decision of the trial court

terminating their parental rights to their two sons, R. and D., pursuant to Code § 16.1-283(C)(2).

On appeal, parents contend the trial court erred by: (1) finding the evidence was sufficient to

terminate their parental rights; (2) finding that the termination of their parental rights was in the

children's best interests; and (3) determining that R. was not of the age of discretion pursuant to

Code § 16.1-283(G). Upon reviewing the record and briefs of the parties, we conclude

this appeal is without merit. Accordingly, we summarily affirm the decision of the trial court. See

Rule 5A:27.

---

     * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

    [1] We refer to the parties by initials only to protect the identities of the children.

## BACKGROUND

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

R. was born in 1989, and D. was born in 1994. The children came into the custody of the Chesapeake Department of Human Services (CDHS) on January 28, 1999 upon petitions filed by CDHS alleging that the children were abused and neglected by their parents. The child protective services unit had learned of R. earlier that month when staff at Maryview Behavioral Health Center reported to CDHS that R. had been admitted to the facility based upon a report from parents that he had threatened to kill himself and others, including his younger brother. R. attacked his mother and hospital staff during the intake process. Parents removed R. from the hospital the next day despite the fact that the hospital staff still considered him to be a risk to himself and others. CDHS also learned that R. had been hospitalized by his parents for several days in 1998. At that time, parents also removed R. from hospital care against the advice of hospital staff.

While in public school, R. displayed a pattern of aggressive acting out and self-destructive behaviors. He threw furniture, kicked and punched walls, banged his head on furniture and cursed in class. He was once physically restrained because of his physical aggression. Parents blamed R.'s behavioral problems on his teachers. Mother was often hostile and belligerent with school staff, screaming at them on the telephone or during meetings. Parents rejected several placements for R. in education programs designed to assist children with severe behavioral problems. Instead they insisted that R. be moved to another public school where the same pattern of behavior was repeated. At one point, an individual was assigned to R. for one-on-one supervision, and R. physically attacked this person. Meanwhile, parents were uncooperative and openly hostile with school officials and R. was eventually suspended from school.

In January 1999, a child protective services worker visited the parents' home. The home was in "shambles" with clothes, partially eaten food, and trash strewn on the floors. D. was very dirty, and both boys had an odor about them. While the worker tried to interview mother, R. repeatedly interrupted the conversation, cursed, and threatened to kill the worker, his mother and his brother. Parents displayed no control over R.'s behavior. At that time, they acknowledged R.'s history of acting out, but stated that they were not going to act on any of the recommendations from school or mental health professionals because these professionals had lied to them and had not been helpful. Mother also indicated that the family had moved over twenty times during the children's lives and had been involved with various mental health professionals.

When D. was four years old and was enrolled in pre-school, he was not potty trained and the school had to purchase diapers for him despite repeated requests to parents to provide diapers. School staff also reported that D. had poor hygiene and poor social skills. Mother was hostile and belligerent with D.'s school staff, and she refused to provide information to them concerning D.'s immunization history.

For the first eight months the children were in foster care, parents declined to cooperate with CDHS. They refused to give to CDHS immunization information about the children and a medical device to treat D.'s asthmatic condition. Parents refused to provide information on where they were living, whether they were employed, and whether they were engaged in any of the services ordered by the court. They refused to provide releases to enable workers to contact their therapist. They declined to participate in a parenting assessment at a child abuse center and complained about the staff at the facility where R. was residing.

R. resided in Maryview from January until March 1999. While there, he was diagnosed with bipolar disorder mixed with psychotic features, post-traumatic stress disorder, and attention deficit hyperactivity disorder. Psychological testing indicated that he was depressed, had poor

emotional control, and had poorly developed psychological coping systems. Other tests showed R. responded to stimuli with aggression and he was not able to function in a "normal" school environment. R. has resided in various residential centers for emotionally disturbed children since he was removed from parents' custody.

D. was placed in a foster home where he had difficulty adjusting to the routine of family life. In 1999, CDHS and parents agreed to a plan to attempt to return D. to parents' home. The in-home services of the Barry Robinson Center (BRC) were engaged to provide services to the family, to supervise visits with D., and to assess the suitability of parents' home for safe placement of D. there. Parents failed to cooperate with the in-home workers and were hostile and angry towards them. Mother denied that the family had any problems, and she yelled at or ignored the service workers. The in-home services workers saw a "primitive" pattern of interaction between parents and D., including limited communication, no "limit-setting," and a "very low indication of attachment." They also noted that parents failed to adequately supervise D. or to be aware of his safety needs. The in-home services program concluded that the family home was "not a suitable environment" for D. and that parents were "not in a condition to receive him into the home."

In February 2000, the Chesapeake Juvenile and Domestic Relations District Court (JDR court) held a hearing on the abuse and neglect petition filed by CDHS. The JDR court adjudged the children to be abused and neglected, and it continued temporary legal custody of the children with CDHS. For several months prior to the hearing, parents had refused to give CDHS their telephone number, refused to cooperate with CDHS, and denied that they had any "problems" to work on. CDHS provided parents with a foster care plan, which listed numerous matters that parents needed to address in order to have the children returned to their custody, including coming to an understanding about their children's conditions and needs, demonstrating a capacity to interact appropriately with others, and maintaining contact with CDHS.

In May 2000, parents provided information to CDHS concerning father's employment and their home address. When a CDHS worker tried to visit the home, mother refused to allow her inside. CDHS also resumed supervised visits between parents and D. at the offices of CDHS. The visits were suspended when parents failed to comply with the terms established for the visits and were verbally abusive to the CDHS worker. The visits were then scheduled to be held at the office of D.'s therapist, but parents failed to follow through with the arrangements.

In 2000, Dr. Susan Garvey, a licensed clinical psychologist, performed evaluations of parents. Dr. Garvey diagnosed mother with "significant psychopathology" which is chronic and ingrained and which impairs her emotional, behavioral and interpersonal functioning. Mother also has numerous health problems. Dr. Garvey found that father exhibited "significant clinical psychopathology" that interfered with his functioning. Dr. Garvey stated that father told her he believed social services was conspiring to take their children and that he and mother did nothing to cause the children to be removed from the home. Dr. Garvey found that both parents exhibited paranoia and cognitive delusions concerning the removal of the children from their home. She opined that their prognosis for improvement is poor. She also indicated that, because parents believe they have done nothing wrong and that they are not part of the problem, they are not motivated to change.

Dr. Garvey observed D. interact with his parents. She saw an "anxious attachment" between D. and both parents. D. maintained physical distance from mother, and there was a lack of spontaneity in their communication. D. played alone during most of the half-hour visit. Based upon her testing, observations and review of psychological evaluations by Dr. Gerstle, a licensed clinical psychologist who had worked with the family, Dr. Garvey recommended that the children not be returned to parents' custody.

In 2001, the JDR court terminated parents' parental rights and awarded custody of the children to CHDS with the authority to place them for adoption. Parents appealed to the trial court, which held several evidentiary hearings in 2002.

Pursuant to the trial court's request, Dr. Garvey updated the evaluation of the family that she had conducted in 2000. Dr. Garvey again interviewed parents and consulted their records with other treating doctors and therapists. She consulted with Dr. Gerstle, who agreed with Dr. Garvey's assessment of parents' personality and parenting functioning. However, Dr. Gerstle disagreed with Dr. Garvey's recommendation that the court terminate parental rights. Dr. Gerstle opined that parents need "intensive treatment" in order to become appropriate parents. He believes parents acknowledge their need for treatment and have become "less intrusive" to their children over the two-and-one-half years he had worked with them. However, Dr. Gerstle also indicated that parents had not improved in terms of taking responsibility for their role in the family's situation and they continue to see themselves as victims of the courts and CDHS concerning the removal of the children from their home.

The BRC staff reported to Dr. Garvey that they had difficulties with parents concerning visitation with R.  R. often became agitated and upset after the visits, so the visits were discontinued. Mother accused the BRC staff of inappropriate and abusive behavior.

In Dr. Garvey's latest interview with mother, she found mother "more subdued" and in better physical health. However, Dr. Garvey again saw evidence of mother's paranoid and delusional thinking and "rigidity," which were the bases for Dr. Garvey's recommendation that mother's parental rights be terminated. Parents acknowledged to Dr. Garvey that they would need "transition assistance" if the children returned home, but they continued to deny that they have any problems that contributed to the removal of the children. Dr. Garvey opined that parents continue to

have "severe difficulties" in their emotional and interpersonal functioning that would render them inappropriate parents to the children.

At the time of the trial court's 2002 hearings, the children had been in foster care for almost four years. D. had been in foster care for almost one-half of his life, and he was living in his fourth placement, a therapeutic foster home. Early in his foster care placement, D. exhibited problems with aggression and an inability to follow instructions. He requires a high level of structure and supervision, but his behavior has improved while he has been in the structured environment of the therapeutic foster home.

At the time of the trial court hearings, R. was living at a residential treatment center. Molly Stoner, a licensed clinical social worker and treatment administrator at R.'s residential placement center, reported that R. has "a pretty significant impairment with his cognitive functioning" and has difficulty managing impulsivity and anger outbursts. R.'s performance I.Q. is in the borderline range of functioning, and he has "very little insight" into how his actions affect others. R., who was thirteen years old at the time of the trial court hearing, expressed a desire to "get back" to his "whole family." When asked why he wanted to return home, R. stated he could get better care at home, such as new clothes, food and a good bed. Stoner testified that R. has the maturity level of a nine or ten year old. Stoner also stated that her goal for R. is to transition him to a foster home, but the foster family would have to be experienced with children with developmental delays, emotional disturbances and significant impairments.

Mother testified that she has been working with Dr. Gerstle since January 1999 and she takes medications prescribed by a psychiatrist. She stated that she was a "monster" in the past, but she would like to work with CDHS to get her "life back." She apologized for her past failures to cooperate with CDHS, and she stated that she now recognizes that she has problems. Mother testified that she is in better control over her emotions, but she needs more therapy and has "years to

go." Mother also stated that she would have to work with the authorities in order to provide for the children's needs. Father acknowledged that parents had made mistakes in the past, he plans to continue in therapy, and he believes parents could work well with CDHS in the future.

The guardian *ad litem*, who had been involved with the family since January 1999, recommended that the trial court terminate the parental rights of both parents.

The trial court found by clear and convincing evidence that the children were neglected by parents prior to their removal from the home, causing the infliction of "severe mental and psychological injury" to the children. The court also ruled that R. is not a person of discretion pursuant to Code § 16.1-283(G). The trial court found that it was in the best interests of the children to terminate the parental rights, and it found no just cause for parents' failure to remedy, within the twelve-month period, the conditions leading to the removal of the children or their failure to cooperate with CDHS.

## ANALYSIS

"In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990). On appeal, we presume that the trial court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Id. at 329, 387 S.E.2d at 796. Furthermore, "[w]here, as here, the trial court heard the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittsylvania County Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986).

The trial court terminated parental rights to the children pursuant to Code § 16.1-283(C), which provides in pertinent part:

> The residual parental rights of a parent or parents of a child placed
> in foster care as a result of court commitment, . . . may be

terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:

\* \* \* \* \* \* \*

2. The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end. Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a public or private social, medical, mental health or other rehabilitative agency shall constitute prima facie evidence of this condition. The court shall take into consideration the prior efforts of such agencies to rehabilitate the parent or parents prior to the placement of the child in foster care.

The evidence, viewed in the light most favorable to CDHS, proved by clear and convincing evidence that: (1) CDHS made "reasonable and appropriate efforts" to help parents remedy the conditions "which led to or required continuation of the [children's] foster care placement" and (2) parents, "without good cause" were "unwilling or unable within a reasonable period of time not to exceed twelve months" from the date of placement in foster care, failed "to substantially remedy" those conditions. Code § 16.1-283(C)(2). For the most part, parents did not cooperate with CDHS over the almost four years the children have been in foster care. Although they now say they recognize that they contributed to the situation resulting in the removal of the children, the evidence shows that parents lack the skills and ability to meet the specialized needs of the children. Indeed, parents admitted that they will need a great deal of assistance should the children be returned to their home.

Pursuant to Code § 16.1-283(C)(2), CDHS presented *prima facie* evidence that parents "without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of [the children]'s foster care placement in accordance with their obligations under and within the time limits or goals set forth in [the] foster care plan[s] filed with the court." Id. Moreover, parents did not rebut that *prima facie* evidence. Therefore, the evidentiary requirements of Code § 16.1-283(C)(2) had been met, and the trial court's findings and judgment were not plainly wrong or without evidence to support them.

In addition, the evidence supports the finding that the termination is in the best interests of the children. Evidence showed that D.'s behavior has improved while he has been in a structured environment and that he may be adopted by a family. R. continues to need intensive residential care, but the long term goal for him is to be placed in a foster home. Over the four years since the boys were placed in foster care, parents have demonstrated little understanding of the needs of these children. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

Last, the trial court did not err in finding that R. is not of the age of discretion pursuant to Code § 16.1-283(G). The evidence showed that R. was thirteen years old at the time of the hearing and that he had the maturity level of a nine or ten year old. His I.Q. is borderline functional, and he has significant impairment of his cognitive functioning. Accordingly, the evidence supports the trial court's ruling.

For these reasons, the decision of the trial court is summarily affirmed.

Affirmed.